RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

INNOVATION VENTURES, LLC,

*Plaintiff-Appellee,*

*v.*

Nos. 12-1635; 13-1817

N2G DISTRIBUTING, INC., a California Corporation, and ALPHA PERFORMANCE LABS, a Nevada Corporation,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit
No. 2:08-cv-10983—Paul D. Borman, District Judge.

Argued: June 18, 2014

Decided and Filed: August 14, 2014

Before: KEITH, CLAY, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** James K. Thome, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellants. Mark A. Cantor, BROOKS KUSHMAN P.C., Southfield, Michigan, for Appellee. **ON BRIEF:** James K. Thome, Timothy J. Connaughton, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellants. Mark A. Cantor, Marc Lorelli, BROOKS KUSHMAN P.C., Southfield, Michigan, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. These consolidated appeals arise from a jury trial followed by a contempt proceeding. At trial, Defendants N2G Distributing, Inc. ("N2G") and Alpha

1

Performance Labs were found to have infringed the trademark and trade dress of 5-hour ENERGY ("FHE")—a product sold by Plaintiff Innovation Ventures, LLC—in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.*  The district court then held Defendants in contempt, along with their owner, Jeffrey Diehl, for violating the permanent injunction entered after trial. Defendants appeal many of the district court's rulings, but for the reasons that follow, we **AFFIRM** the district court in full.

## BACKGROUND

### A.     5-Hour ENERGY

Plaintiff is the marketer, distributor, and seller of FHE.  FHE is an energy shot, which is an energy drink sold and consumed in small portions.  Plaintiff began selling FHE in August 2004 after just a few months of development.  FHE was not the first energy shot to hit the market, but it did have a unique angle.  While other energy drinks targeted young consumers, Plaintiff marketed FHE to working adults.  Plaintiff hoped that these consumers would come to see FHE as a replacement for an afternoon cup of coffee or a caffeinated soda.

Plaintiff's 2004 sales of FHE totaled, at most, a few hundred thousand dollars.  In 2005, sales were $3 million.  Sales increased astronomically from there.  Plaintiff sold over 200 million bottles of FHE between 2006 and 2008.  By March 2009, FHE controlled nearly 70% of the market for energy shots.  Sales of FHE totaled over 460 million bottles in 2011, which translated into $620 million of revenue.  Plaintiff budgeted approximately 25% of its gross sales to go to advertising for FHE.  Thus, Plaintiff spent over $40 million in advertising in 2008, and over $120 million in 2010.

Plaintiff also took steps to protect the FHE mark.  In June 2004, Plaintiff submitted "5-hour ENERGY" for trademark registration with the U.S. Patent and Trademark Office ("PTO"). The PTO rejected Plaintiff's application in January 2005, deeming the mark too descriptive to be eligible for trademark protection.[1]  Plaintiff placed FHE on the Supplemental Register in

---

[1]By contrast, we have held that the "5-hour ENERGY" mark was "suggestive and thus protectable" by at least March 2006. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 730 (6th Cir. 2012).

September 2005.**2**   Plaintiff eventually secured a trademark for "5-hour ENERGY" in August 2011, shortly before this case went to trial.

Plaintiff also attempted to protect its mark and market position through litigation. While Plaintiff was not the first energy shot on the market, it was the first to achieve widespread success. This success attracted hundreds of competitors. Plaintiff had to defend suits from other market participants who believed Plaintiff was infringing on protected marks. And Plaintiff itself sued many new-comers that Plaintiff's executives believed were infringing FHE's name and trade dress. Defendants' range of energy shots was one of Plaintiff's targets.

## B.      Defendants' Products

Jeffrey Diehl has been in the dietary supplement game since the mid-1990s. In those early days, Diehl produced pills and powders going by the name of "Nitro2Go Herbal Energizer," "Max Diet Formula," "Sexual Enhancement Formula," and "Explosive Ginseng." In 2005, Diehl founded N2G, and served as its president.

In 2007, Diehl came out with his first energy shot. Diehl wanted to sell an array of energy shots with different names, so he created Alpha Performance Labs to market and distribute this universe of products. In early 2008, Diehl began to market and sell "6 Hour Energy Shot," "Nitro2Go Instant Energy," and "Extreme Monster Energy Shot." As the picture below of 6 Hour Energy shows, the bottle bears some resemblance to FHE's bottle (on the left).

---

**2**"Designations that have not yet acquired a trademark significance but are capable of doing so may be registered on the Supplemental Register," which was created by 15 U.S.C. § 1091. 3 McCarthy on Trademarks and Unfair Competition § 19:32 (4th ed. 2013). "[A] Supplemental Registration confers no substantive trademark rights beyond those under common law [and] [s]ection 26 of the Lanham Act expressly excludes Supplemental Registrations from certain advantages gained by registration on the Principal Register." *Id.* § 19:36 (footnote omitted).

 

Diehl testified that he gave 6 Hour Energy a red, yellow, and black color scheme because he had been using these colors in his Pure Energy powder since 2000. The hiker on the bottle was apparently a reference to Diehl, who enjoys a vigorous walk. The bottles of 6 Hour Energy and Nitro2Go Instant Energy both had warning labels. These labels mimicked the warning label found on FHE's bottle word-for-word. Despite this coincidence, Diehl testified he had never heard of Plaintiff's product before coming out with 6 Hour Energy.

### C.    Litigation and Trial

In March 2008, one of Plaintiff's customers was attending a trade show in Dallas and saw a flyer advertising Defendants' energy shots. The customer e-mailed the flyer to Plaintiff's President on March 3, 2008. Four days later, Plaintiff filed this lawsuit, claiming that Defendants' 6 Hour Energy Shot violated the Lanham Act by infringing on FHE's trademark and trade dress. Also in March 2008, Plaintiff applied for a copyright of its warning label.

On April 9, 2008, the district court issued a preliminary injunction barring Defendants from selling 6 Hour Energy, any other products that use FHE's trade dress, and any products that use packaging confusingly similar to FHE's trade dress. The court also ordered Defendants to recall 6 Hour Energy from the market. Defendants had sold approximately 77,000 bottles of 6 Hour Energy by that point, and received almost half of these bottles back after the recall. Diehl testified at trial that he destroyed the returned product. All told, Diehl and Defendants took a

huge loss on 6 Hour Energy. Diehl also had to take his Extreme Monster Energy Shot off the market after complaints of trademark and trade dress infringement from the makers of Monster energy drink—one of the largest players in the energy drink market.

Shortly after the district court enjoined 6 Hour Energy, Diehl came out with a shot version of Pure Energy. Diehl's attorney at the time told him that Pure Energy was probably not confusingly similar to FHE. Diehl's own experience with trade dress litigation reinforced his lawyer's advice. But in mid-2008, Plaintiff amended its complaint to allege that Pure Energy also infringed on FHE's trademark and trade dress. Diehl discontinued the Pure Energy shot in late 2008. Diehl and Plaintiffs repeated this revise-and-amend cycle several more times. In the end, Diehl came out with seven products in addition to 6 Hour Energy that Plaintiff claimed infringed on the FHE trademark and trade dress.

After much more procedural wrangling (we address the relevant portions in our discussion below), the case went to trial. Plaintiff presented three claims to the jury—trademark infringement, trade dress infringement, and false advertising—involving seven of Defendants' products. The jury was also asked to consider whether Defendants' infringement was intentional. The jury found that six of Defendants' products infringed on the FHE trademark; that 6 Hour Energy and two other products infringed on FHE's trade dress; that all of Defendants' infringement was intentional, save for one product; and that two of Defendants' products were falsely advertised. (Pictures convey these findings more easily than words, so we attach the verdict form as an Appendix.) The jury awarded Plaintiff $1.75 million in damages.

**D.      Injunction and Contempt**

On May 23, 2012, the district court issued a permanent injunction, prohibiting "Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them," from selling the six products found to infringe on the FHE trademark and trade dress. (R. 362, Permanent Injunction, at 8962.) The injunction also barred selling products that used "marks that are confusingly similar to" FHE's trademark and trade dress. (*Id.* at 8963.) Defendants were ordered to hand over all the products subject to the injunction and file a report detailing their compliance. Defendants filed this report, which Diehl signed under penalty of perjury. (Diehl was not personally enjoined since he had not been

named as a party and served with process, but he continued to act on behalf of Defendants.) Diehl reported that he had long ago stopped selling 6 Hour Energy and Pure Energy; that he had changed the labels for all the other infringing products, and thus was not violating the injunction; and that he had instructed the enjoined products not be sold on the Nitro2Go website. In July 2012, both Defendants declared bankruptcy.

Plaintiff did not take Diehl's representations at face value, and conducted its own investigation into Defendants' compliance with the injunction. In July 2012, Plaintiff had three separate orders placed on the Nitro2Go website. Each of these orders contained enjoined products, plus products with modified labeling that were being advertised on the website:



These modified products were marketed by a new company, Nitro Rocks Distributing, and the orders were filled by a company called ETC Distributing. According to Diehl, N2G licensed the Nitro2Go name to Nitro Rocks Distributing, which in turn sold product to ETC

Distributing.   ETC also purchased products directly from Defendants before the permanent injunction issued.

Just like N2G and Alpha Performance labs, these new companies were Diehl's corporate creations.  Diehl founded Nitro Rocks and owns 100% of the company.  Nitro Rocks operates out of the same offices as N2G, in a building that Diehl owns.  ETC is a California corporation that Diehl founded along with Hratch Djanbatian in June 2010.  Djanbatian became the sole owner of ETC on November 2, 2011, less than a week before trial started in this case.  Diehl remains ETC's manager, and has signing power on the company's bank account.  Like Nitro Rocks, ETC operates out of the same building where N2G used to do business.  Diehl's testimony during N2G's bankruptcy proceeding revealed additional overlaps among these various companies—most egregiously, Diehl testified under oath that these various entities comingle assets essentially based on Diehl's whims.

With all this information in hand, Plaintiff moved the district court to hold Defendants and Diehl in contempt of the permanent injunction.  In response, Diehl and Djanbatian investigated how enjoined products could still be shipped to online customers.  Djanbatian found that the first order Plaintiff made had been filled by a new ETC employee who, unbeknownst to the corporate higher-ups, tossed in some enjoined products.  Yet in April 2013—over six months after Plaintiff filed its motion for contempt—enjoined products were still being advertised on Groupon, a daily-deals website.  An inspection of the ETC warehouse in April 2013 also showed that scores of bottles of enjoined products were still in stock—despite Diehl's assurances that the products had been destroyed.

On May 15, 2013, the district court held Defendants and Diehl in contempt for selling specifically enjoined products, as well as modified products that remained confusingly similar to FHE.  The court found that Diehl's conduct "evidence[d] a refusal to fully comply with this Court's permanent injunction order.  Diehl's shifting of assets into a new corporation, and the minor changes made to his product labels, are the actions of an individual trying to hide from and avoid his obligations under this Court's order." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2013 WL 2145677, at *6 (E.D. Mich. May 15, 2013).  The court ordered Diehl to fully comply with the permanent injunction and destroy all enjoined and confusingly

similar products, or risk fines of $1000 per day of noncompliance. As far as we know, this ultimatum has worked.

## DISCUSSION

### I.    TRIAL AND PRE-TRIAL APPEAL

Defendants' first appeal stems from the district court's denial of their motion for a new trial and for relief from the judgment, which itself addressed: the sufficiency of the evidence supporting the jury's verdict; an alleged inconsistency in the jury's verdict; several procedural and evidentiary rulings made by the district court; and an issue concerning the propriety of the judgment entered. The district court rejected all of these arguments. We review the district court's decisions on each of these issues for abuse of discretion.[3] "An abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard. We will find an abuse of discretion only when the Court has a definite and firm conviction that the trial court committed a clear error of judgment." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006) (quotation marks and citation omitted). We address the numerous issues Defendants raise on appeal in turn.

### A.    Lanham Act Claims

First and foremost, Defendants contend that the district court should have ordered a new trial on Plaintiff's claims of trademark and trade dress infringement, in violation of the Lanham Act. Defendants made their motion pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. This Rule allows district courts to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This Rule requires a new trial "only when a jury has reached a seriously erroneous result as evidenced by [among other things] the verdict being against the weight of the evidence." *Mike's Train House*, 472 F.3d at 405 (quotation marks and alteration omitted). "But granting a new trial on this ground is a rare occurrence . . . . Therefore, we will uphold the

---

[3]*See Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012) (Fed. R. Civ. P. 59); *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (discovery and evidentiary rulings); *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 618 (6th Cir. 2007) (Fed. R. Civ. P. 49); *In re Walter*, 282 F.3d 434, 440 (6th Cir. 2002) (Fed. R. Civ. P. 60).

verdict if it was one which the jury reasonably could have reached; we cannot set it aside simply because we think another result is more justified."[4]  *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012).

### 1.     *Likelihood of confusion*

The Lanham Act creates a private cause of action to protect trademarks and trade dress where there is a likelihood of confusion between the defendant's mark and the plaintiff's protected mark.  *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 728 (6th Cir. 2012); *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006).   Defendants effectively concede that the Lanham Act protects FHE's trademark and trade dress, and did so as of the moment 6 Hour Energy came on the market.  Defendants' sole argument on appeal is that there was insufficient evidence of a likelihood of confusion between their products and the FHE mark.

Courts and juries consider the following factors in determining whether a plaintiff has proved that a likelihood of confusion exists:

> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.

*Innovation Ventures*, 694 F.3d at 731 (quoting *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)); *see also Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013).   "Not all of these factors will be relevant in every case"; indeed, the jury in this case was not instructed on the eighth factor. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002).   In the process of applying these factors, "the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Id.*

---

[4]Defendants also claim that the district court should have granted a new trial pursuant to Fed. R. Civ. P. 60(b)(6).   However, this Rule "applies only in exceptional or extraordinary circumstances." *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 468 (6th Cir. 2007) (quotation marks omitted).   Defendants have not even attempted to show, nor do we perceive, that such circumstances exist in this case.

(quotation marks and alteration omitted). In other words, the likelihood-of-confusion factors can rarely be applied with mathematical precision—this is a holistic endeavor.

### 2. *Trademark claim*

The record shows that the jury heard ample evidence to support Plaintiff's claim that a likelihood of confusion existed between Defendants' products and the trademark "5-hour ENERGY."

First—and most importantly—the jury could use their eyes and see that Defendants' products use similar marks. All six of the products found to infringe the FHE trademark feature a number (6, 7, or 14) followed by "Hour" (either singular or plural) and "Energy." There are only three differences between Defendants' products and the FHE trademark: the number preceding "Hour" and "Energy," the fact that some of Defendants' products use the plural "Hours," and the fact that some of Defendants' products include a "+" or some other miniscule type between "Hour" and "Energy." These discrete differences should not be considered in isolation—we "view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997).

Second, the jury heard extensive testimony on the strength of the FHE mark. Deborah Jay, president of a survey research firm, presented the results of a market survey she had done on the strength of the name "5-hour ENERGY." The survey was conducted over the phone with people Jay identified as prospective purchasers of energy shots. 300 people qualified to take the survey. Half of these people were a control group, and were asked to give their responses to a fictitious brand name. The other half were asked about FHE. Jay testified that the survey showed that FHE was a strong brand. Defendants attacked the survey as skewed because of the number of nonresponders (meaning people who don't want to take a telephone survey). Defendants also suggested that the survey may have only reflected the spike in FHE's advertising that took place after Defendants had pulled their first products off the market. The jury heard these attacks, but could nonetheless have accepted the results of Jay's survey. Plaintiff also presented the testimony of Howard Marylander, who had performed his own market survey study—this one online. Marylander's study showed that people generally

perceived FHE as a brand name, not a generic name. As with Jay's study, Defendants attacked the strength of Marylander's results. But as with Jay's study, the jury was entitled to credit Marylander's conclusion that FHE was a robust mark.

Next, it can hardly be disputed that Plaintiff's and Defendants' goods are related—both are two-ounce energy shots. The jury also heard testimony that the parties used similar marketing channels to push their products. While Defendants did not advertise their products on television, both parties advertised at points of sale, very often at convenience stores. One exhibit even showed the parties' display boxes side-by-side next to a convenience store cash register. In addition, the jury heard testimony that "especially in the convenience store, there's a very large amount of what's called impulse purchase. So people don't go into the store planning to buy whatever the item is, but when they see it at the—when they see it front and center, which could be an end cap or, better yet, a cash register placement, they'll tend to buy it." (R. 317, Trial Tr. (Henderson), at 6859.) In other words, FHE customers were not tremendously careful when they entered the energy shot market and could easily be confused by proximate placement of the parties' products. *See Gray v. Meijer, Inc.*, 295 F.3d 641, 649–50 (6th Cir. 2002).

Defendants focus on two of the likelihood-of-confusion factors that they claim should have tipped the verdict in their direction—actual confusion and Defendants' intent. "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion. [But] [d]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant . . . ." *Daddy's Junky*, 109 F.3d at 284 (quotation marks and citation omitted). Thus, Plaintiff did not need to show actual confusion to prevail at trial. But in reality the jury did hear evidence of actual confusion. Lynn Petersmarck, an advertising purchaser for Plaintiff, recounted a conversation she had with a representative from the Discovery Channel at a television industry event. The representative told Petersmarck that he loved FHE, and even said he had one in his pocket. The bottle in his pocket was actually a 6 Hour Energy—Defendants' product. This Court has held that a single instance of actual confusion can, in some cases, "increase the likelihood of confusion," *id.*, even if stronger evidence of actual confusion can come in the form of robust consumer surveys. *See Groeneveld*, 730 F.3d at 517.

As for Defendants' intent to confuse consumers, Defendants claim that Diehl's testimony absolves them on this factor. True, Diehl testified that he only wanted to compete with FHE fairly in the free market. But the jury had the liberty to disregard Diehl's self-serving testimony based on their evaluation of his credibility. Furthermore, Plaintiff elicited circumstantial evidence of intent. The 6 Hour Energy bottle contained a warning label identical to the one found on FHE. Diehl claimed that this was mere happenstance. But a jury could have inferred from the labels that Diehl was aware of FHE's mark before he introduced 6 Hour Energy and all of his other products onto the market.[5] *See Daddy's Junky*, 109 F.3d at 286 ("[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying," and thus suggest an intent to confuse.). Moreover, Plaintiff did not need to prove intent to prevail on its trademark claim: "Proving intent is not necessary to demonstrate likelihood of confusion." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004).

The likelihood of confusion analysis is not mechanical—the factors the jury considered were "simply a guide to help determine whether confusion is likely." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). The jury heard ample evidence that an "ordinary consumer who would consider buying" FHE could likely be confused by the marks on Defendants' products. *Groeneveld*, 730 F.3d at 509. The district court did not abuse its discretion in denying Defendants' motion for a new trial.

### 3. *Trade dress claim*

The Lanham Act applies to trade dress in addition to trademarks. "Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Id.* at 503 (quotation marks omitted). A plaintiff must prove a likelihood of confusion between its protected trade dress and the defendant's products using the same factors juries consider in a trademark claim. *See Gen. Motors*, 468 F.3d at 414.

---

[5]All of these facts equally supported the jury's finding that Defendants' infringement was intentional as to all but one of their products.

Most of the factors discussed in the trademark infringement analysis equally support the jury's verdict of trade dress infringement: specifically, the "the relatedness of the goods or services offered by the plaintiff and the defendant," "evidence of actual confusion, [] the marketing channels used by the parties, [] the probable degree of purchaser care and sophistication, [and] the defendant's intent in selecting its mark." *Innovation Ventures*, 694 F.3d at 731. Plaintiff did not introduce evidence about the strength of FHE's trade dress, but Plaintiff did introduce several television advertisements that emphasized the look and size of the FHE bottle.

These factors, plus a brief glance at the parties' competing products, show that the district court did not err in denying Defendants' motion. But according to Defendants, their products simply contain a visually appealing combination of colors and shapes—any similarity to FHE is purely fortuitous. Defendants also point out that their products omit the color blue, which features prominently on the FHE bottle. But a product's trade dress "is essentially its total image and overall appearance. It involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (quotation marks and citation omitted). We do not approach trade dress claims by parsing minute differences between products—we focus on "the overall visual impression the two [products] create." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 647 (6th Cir. 2002). The jury was able to use its eyes, look at the various products before it, and decide that a likelihood of confusion existed between Defendants' products and FHE. It was not an abuse of discretion to deny Defendants' motion for a new trial.

### 4.     *Fair use defense*

Finally, Defendants contend that even if the names of their products were confusingly similar to Plaintiff's, the fair use doctrine should shield them from liability. "In evaluating a defendant's fair use defense, a court must consider whether the defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 612 (6th Cir. 2009) (quotation marks and alteration omitted). The jury heard two facts that suggested Defendants did not use their marks in a descriptive sense—that is, to describe what the

product did. One, Defendants' first energy shot featured a ™ symbol after the term "6 Hour Energy." Diehl explained that he used this symbol because "I wanted the term '6 Hour Energy Shot' to be mine, just like 5-hour ENERGY is [Plaintiff's]." (R. 319, Trial Tr. (Diehl), at 7202.) But the jury was entitled to draw the inference that Defendants were not simply describing their product, they were attempting to lay claim to a mark. Two, Diehl testified that he had no basis for claiming that his products gave 7, 7+, or 14 hours' worth of energy. A jury could infer that Defendants did not intend to describe what their products did when Defendants weren't sure of that themselves.

Furthermore, the evidence that supported the finding of intentional infringement also supported a finding of bad faith. The jury heard circumstantial evidence suggesting that Defendants knew of Plaintiff's protected mark and proceeded to copy it. A reasonable jury could have inferred from this fact that Defendants' various marks were not used in good faith.

## B.     Inconsistent Jury Verdict

Next, Defendants argue that the jury's verdict was inconsistent because the jury found that one of Defendants' products, Nitro2Go Instant Energy Extra Strength, did not violate FHE's trademark, but other Instant Energy Products, with very similar names and bottles, did (all these products feature on Page ID 6610 of the attached verdict form).[6] Rule 49(b) of the Federal Rules of Civil Procedure allows a trial judge to "submit to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide." Fed. R. Civ. P. 49(b)(1). Rule 49(b) also establishes how courts should proceed when answers to the special questions of fact are inconsistent. If the interrogatory answers are "consistent with each other but one or more is inconsistent with the general verdict," the district court has the option of either approving a judgment, directing the jury to think harder about its answers, or ordering a new trial. Fed. R. Civ. P. 49(b)(3). "When the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the

---

[6]Defendants also argue that some of the jury's findings of intentional infringement are inconsistent because (in Defendants' opinion) there was no evidence to support them. This argument fails because Rule 49 is not the appropriate vehicle for claims of insufficient evidence. *See Jewell v. Holzer Hosp. Found., Inc.*, 899 F.2d 1507, 1511 (6th Cir. 1990).

court must direct the jury to further consider its answers and verdict, or must order a new trial." Fed. R. Civ. P. 49(b)(4).

We do not reach the merits of Defendants' inconsistent verdict argument, however, because Defendants waived their Rule 49(b) objection. Our settled interpretation of this Rule required Defendants to raise their inconsistency objection before the jury was discharged. *See Fencorp, Co. v. Ohio Ky. Oil Corp.*, 675 F.3d 933, 944 (6th Cir. 2012). "The purpose of the rule is to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury. This prevents a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 618 (6th Cir. 2007) (quotation marks omitted). Defendants here had the opportunity to object before the jury was discharged. Despite this, they waited until their post-trial motions to raise this issue. Parties cannot use Rule 49(b) as a get-out-of-jail-free card—one last chance to get a new trial based on issues that the jury could easily have resolved. Defendants have waived their objection to any purported inconsistencies between the general verdict and the special interrogatories.

## C.        Discovery Dispute

Defendants next argue that they were denied access to necessary discovery—namely, the secret formula of FHE. Not only do we review the district court's discovery rulings for abuse of discretion, "[r]eversal is proper only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *Himes v. United States*, 645 F.3d 771, 782 (6th Cir. 2011) (quotation marks omitted). Defendants do not satisfy this exacting standard.

During discovery, Plaintiffs requested the formula for Defendants' products. These formulas were directly relevant to one of Plaintiff's claims—false advertising. To prevail on this claim, Plaintiff needed to prove, among other things, that Defendants "made false or misleading statements of fact concerning [their own] product[s]." *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 323 (6th Cir. 2001). If Defendants' bottles said the products produced seven or more hours of energy (however that is defined), but the formulas were incapable of having this effect on consumers, this discrepancy would go a long way towards proving

Plaintiff's case. Defendants objected to this request, but as a fallback position, asked for reciprocal production of Plaintiff's formula. The court granted Plaintiff's request for the formulas, but denied Defendants' copycat demand.

Defendants' formulas were directly relevant to Plaintiff's claim of false advertising, and therefore clearly discoverable under Rule 26 of the Federal Rules of Civil Procedure. But Defendants had no counterclaim or defense that would make Plaintiff's formula directly relevant to their case. Defendants instead rely on a bank-shot theory of relevance. Plaintiff introduced a study at trial indicating that FHE exhibited indicators of "energy" at the six-hour mark in some people. Defendants argue that if Plaintiff's formula had been produced, Defendants could have compared their own formulas with Plaintiff's, and then extrapolated whether their products could provide energy after seven or more hours. One of Plaintiff's expert witnesses testified why this simple comparison would be of little practical use: "Just because you have a blend and it has certain ingredients, unless you know the quality, the amounts, the ingredients, you wouldn't be able to make a claim certainly that it worked better unless you did a comparative effect of the study to actually do a study to compare that." (R. 317, Trial Tr. (Kreider), at 6965–66.) In other words, even if Defendants had been given access to Plaintiff's formula, that information would have been of little use without a comparative study.

But more to the point, Defendants had a far easier method to evaluate their own products—they could perform an independent test of their effectiveness. Plaintiff's formula is a highly proprietary, competitive secret that would have been only marginally relevant, at best, in this trial. It is "highly unlikely" that Defendants would have achieved a better result at trial if they had access to the FHE formula. *Varga v. Rockwell Int'l Corp.*, 242 F.3d 693, 700 (6th Cir. 2001). The district court therefore did not abuse its discretion in denying Defendants' copycat request for production.

### D.　　Evidentiary Rulings

Defendants next assert that the district court erred in three sets of *in limine* evidentiary rulings concerning other litigation involving the parties. Both Plaintiff and Defendants wanted to use evidence of these other cases to assist their presentation to the jury. We cannot find fault in the district court's handling of any of these evidentiary disputes.

1.      *The Herbal Nitro case*

In 2002, Defendant N2G sued the sellers of a product called "Herbal Nitro" for trade dress infringement.  Herbal Nitro and N2G both made dietary supplements in capsules, and N2G—or rather, Diehl—believed that the packaging for Herbal Nitro was confusingly similar to N2G's.  However, the court hearing the case concluded that the two products' packaging was too dissimilar to maintain a trade dress claim.

Defendants sought to introduce evidence of the Herbal Nitro case at trial to show that Diehl did not intend to infringe FHE's trade dress.  Defendants claimed that Diehl's experience with the Herbal Nitro case taught him that so long as there were slight differences between packages, he could not be held liable for violating the Lanham Act.  The district court allowed Defendants to present precisely this evidence at trial.  But Defendants claim this was not enough—they wanted to introduce the court's written opinion in the Herbal Nitro case.  That opinion, authored by a different judge in a different circuit, might well have confused the issues at trial or misled the jury.  *See* Fed. R. Evid. 403.  Defendants got to tell the jury the substance of the Herbal Nitro opinion.  The district court did not err by regulating the form this evidence took.

2.      *The Monster case*

In 2008, Hansen Beverage Company ("Hansen"), the maker of the Monster line of energy drinks, sued N2G for infringement of the Monster trademark and trade dress, based on N2G's Extreme Monster Energy Shot.  Plaintiff asked to introduce the complaint from the Monster case, a picture of an advertisement featuring the 6 Hour Energy and Extreme Monster shots, and these pictures of the Monster can (the image on the left, which actually depicts a sixteen-ounce can) and the Extreme Monster Energy Shot (on the right, a two-ounce bottle):



Plaintiff asserted that this evidence was probative of Defendants' motive, intent, or lack of mistake in choosing a name and appearance for their products that was similar to FHE. *See* Fed. R. Evid. 404(b). The district court excluded the complaint for the same reasons it excluded the court order from the Herbal Nitro case. But the court allowed the photographs to go to the jury—just without the context that Defendants' product had sparked a lawsuit.

Defendants do not argue that this evidence was improperly admitted under Rule 404(b). Rather, Defendants assert that this evidence is not relevant. *See* Fed. R. Evid. 401(a). Defendants are clearly wrong. As just one example of relevance, Defendants advanced a fair use defense, which required them to prove good faith. The picture of the Monster can side-by-side with Defendants' product shows that at the same time Defendants were conceiving 6 Hour Energy, they were also imitating the trade dress of another major player in the energy drink market. A jury could use this evidence to infer that Defendants' choice of trade dress was not a mistake. As a matter of simple relevance, the district court did not err in admitting these photographs.

Defendants also argue that the jury should not have heard evidence of a settlement between N2G and Hansen. The court did not rule *in limine* on the admissibility of this evidence—the issue first came up at trial. Diehl testified on direct examination that he did not think the Extreme Monster Energy Shot infringed on the Monster trade dress based on his

personal acquaintance with the president of Hansen.   Defense counsel stopped that line of questioning there to ensure that the jury did not hear about the lawsuit sparked by Extreme Monster.  But Plaintiff's attorney followed up on this line of questioning in cross-examination, asking Diehl if he thought Monster had inspired the Extreme Monster Energy Shot.  Diehl testified that the two products were "totally different," despite their similar appearance.  (R. 319, Trial Tr. (Diehl), at 7209.)  Plaintiff's attorney again followed up:

> [Plaintiff's Counsel]:  And Monster complained to you, didn't they?
>
> [Diehl]:  About the coloring of the product?  No.  In fact, *when we discussed the settlement issue*, they offered me $50,000 not to use these colors because they were my colors.  My product was out before theirs was.
>
> [Plaintiff's Counsel]:  Your Honor, I move to strike.  That's hearsay.
>
> The Court:  Well –
>
> [Plaintiff's Counsel]:  But let me ask you a question.  So how did you end up resolving it then?
>
> [Diehl]:  I had made a mistake on that, which I owned up to.  Apparently, and again, lack of knowledge, I didn't know, because I asked [Hansen] whether or not they were even going to make a shot, and I made a shot that used the term "Monster" in a totally different context, and what I didn't understand is that even though energy drinks have a different category in the registration, they had registered it in supplements, and because I used the term "Extreme Monster Energy Shot," and the key words there being "Monster" and "Energy," that's what they had copywritten and even though they didn't have a product on the market like that, apparently the mark carried over, and as soon as I knew that, I pulled it immediately.
>
> [Plaintiff's Counsel]:  And you paid them, didn't you?
>
> [Diehl]:  Yes, I did.

(*Id.* at 7209–10 (emphasis added).)

Defendants never objected to Plaintiff's questions concerning Monster.  We therefore review this issue for plain error.  *See Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 548 (6th Cir. 2003).  Under this standard, we will only reverse if the district court made an error that was plain and affected Defendants' substantial rights.  *See United States v. Demjanjuk*, 367 F.3d 623, 629 (6th Cir. 2004).  Assuming these conditions are met, "we can address the error if we find, in our discretion, that the error seriously affects the fairness, integrity, or public reputation of judicial

proceedings." *Griffin v. Finkbeiner*, 689 F.3d 584, 598 (6th Cir. 2012) (quotation marks omitted).

Even assuming that the jury should not have heard Diehl's testimony about his settlement with Hansen, Defendants cannot establish the remaining elements of plain error. Diehl himself was the first one to gratuitously raise the question of settlement. If the jury credited his testimony, they would have come away with a better impression of him than had the evidence been excluded. In Diehl's version of events, the makers of Monster first offered to pay *him* $50,000 to take his product off the market. The jury also heard Diehl say that when he found out that his products might infringe on the Monster mark, he pulled Extreme Monster off the shelves. These facts suggest that Diehl was solicitous towards others' intellectual property—the very opposite of a serial infringer. Diehl's self-serving testimony did not infringe on Defendants' substantial rights, let alone seriously affect the integrity of the trial.

### 3. *Other litigation involving Plaintiff*

Finally, Defendants assert that they should have been permitted to introduce evidence about Plaintiff's business strategy of protecting its trademark and trade dress through litigation. The flaw in Defendants' argument is that they *did* introduce a great deal of evidence concerning Plaintiff's litigiousness. Defendants concede this fact, but aver that they were prejudiced by not being allowed to tell the jury the outcome of Plaintiff's other cases. The district court did not err in concluding that the probative value of this evidence was substantially outweighed by its potentially deleterious impact on the trial. Plaintiff's motive in bringing this case was all but irrelevant—what mattered what whether Defendants' products were confusingly similar to FHE.

### E. Plaintiff's Counsel's Conduct at Trial

Defendants' next claim of error focuses on questions asked by Plaintiff's counsel at trial that, Defendants assert, willfully violated the district court's *in limine* orders. To prevail on this claim, Defendants "must make a concrete showing that the conduct consistently permeated the trial such that [Defendants were] unfairly prejudiced by the misconduct." *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 835 (6th Cir. 2013) (quotation marks omitted). "In making this assessment, we look at the totality of the circumstances, including the nature of the comments,

their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself." *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 249 (6th Cir. 2011). "If we determine that counsel made improper comments, we may set aside the verdict only if there is a reasonable probability that the verdict of the jury has been influenced by such conduct." *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (quotation marks omitted). Not only do we review the district court for abuse of discretion, in this particular context, we give a "high level of deference . . . to the trial court in determining whether improper comments prejudiced the jury." *Id.* at 762.

Defendants point to two lines of questioning that they say contravened the district court's pre-trial evidentiary rulings—the questions to Diehl about the settlement of the Monster Energy case which are detailed above, *supra* at 18–20, and questions about the substance of the Herbal Nitro case. Defendants' latter complaint is somewhat odd since they were the ones who wanted to introduce evidence about the Herbal Nitro case to show Diehl's lack of intent. Defendants in fact did just that—asking Diehl on direct about the conflict between him and the maker of Herbal Nitro, the outcome of that conflict, and what Diehl learned from his experience. Plaintiff's counsel returned to this subject on cross-examination. Like Defense counsel, Plaintiff's attorney only referred to the "controversy" regarding Herbal Nitro. (R. 319, Trial Tr. (Diehl), at 7183.) But Diehl himself responded to one of these questions by mentioning that he "went to court." (*Id.*) Plaintiff's counsel followed Diehl's lead, asking him whether the case had ended favorably for Diehl. And when Plaintiff's attorney thought that Diehl was lying on the stand, he tried to introduce the court's written opinion for impeachment purposes. He never got the chance. Defendants' counsel objected, and the court sustained the objection.

Plaintiff's questions about Monster Energy and Herbal Nitro fall short of the type of conduct that would warrant reversing the district court. These questions happened in the space of a few minutes during a multi-day trial. A jury could have interpreted the questions and Diehl's responses favorably for Defendants. And the jury was inundated with other evidence supporting Plaintiff's claims—above all, the evidence of Plaintiff's and Defendants' products

seen side-by-side.  The district court did not abuse its discretion in denying Defendants' motion for a new trial on these grounds.  *See Tompkins*, 726 F.3d at 836.

### F.          Entry of Judgment

Finally, Defendants argue that that the district court erred when it denied their Rule 60 motion to set aside the judgment entered following the jury trial and replace it with two separate judgments memorializing the portions of the jury verdict that favored Defendants.  This claim borders on the absurd.

The judgment entered after trial simply states that the jury returned a verdict and that Defendants must pay Plaintiff $1.75 million.[7]  The judgment makes no mention of the claims presented to the jury, much less how the jury ruled on each.  Defendants objected to the form of this judgment, and asked the court to strike it from the record and replace it with two new judgments—the first stating that the jury had not found that one of Defendants' products violated the FHE trademark, and the second stating that the jury had not found that four of Defendants' products falsely advertised themselves.  Defendants claim that Rule 58(a) supports their position, since that Rule requires that "[e]very judgment and amended judgment must be set out in a separate document."  According to Defendants' opaque reasoning, Rule 58(a) requires the district court to memorialize all of the jury's factual findings in separate documents.

Defendants entirely misapprehend the purpose of the separate-document rule.  This rule was "intended to avoid the inequities that were inherent when a party appealed from a document or docket entry that appeared to be a final judgment of the district court only to have the appellate court announce later that an earlier document or entry had been the judgment and dismiss the appeal as untimely."  *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 385 (1978) (per curiam).  The separate-document rule was thus designed to ensure finality, clarity, and efficiency.  Defendants' request would have had the opposite effect.  By fracturing a single judgment into multiple ones, Defendants would have sowed confusion using a Rule that was designed to eliminate it.  The district court did not abuse its discretion in denying this motion.

---

[7]Defendants claim that the district court never approved the judgment.  This is false.  The court approved the first judgment entered after trial.  A corrected judgment was later issued, which was substantively identical to the judgment the court explicitly approved.

## II.    CONTEMPT APPEAL

After the jury returned its verdict, the district court permanently enjoined Defendants and their associates from selling the products found to infringe on the FHE trademark and trade dress.  The court also enjoined Defendants from selling products that were confusingly similar to FHE.  After Plaintiff discovered that Defendants were selling specifically enjoined products and modified versions of the enjoined products, the district court held Defendants and Diehl in contempt.  Defendants have appealed the district court's contempt ruling that relates to the modified products.[8]  The district court did not hold that the modified products themselves would violate the Lanham Act.  Rather, the court used the so-called "Safe Distance Rule" to find that the modified products were confusingly similar to FHE's trademark and trade dress.  We review the district court's factual findings for clear error and its contempt ruling for abuse of discretion. *See Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996).  This means that we will not reverse the district court "simply because we would have decided the case differently. Rather, a reviewing court must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quotation marks and citation omitted).  Employing this standard of review, we see no reason to reverse the district court.

### A.    The Safe Distance Rule

A court's ability to issue injunctions, and then enforce those injunctions with a finding of contempt, springs from the court's inherent equitable powers. *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812). Equity allows courts, faced with recalcitrant parties who repeatedly violate the law, to craft permanent injunctions which "proscribe activities that, standing alone, would have been unassailable." *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994) (quotation marks omitted).  This equitable principle goes by a specialized name in the context of permanent injunctions to protect intellectual property—the Safe Distance Rule.  Like the general principle,

---

[8]Defendants also appealed the district court's holding them in contempt for selling the specifically enjoined products.  But at oral argument, Defendants abandoned this ground for appeal as moot.  In any event, the district court did not commit any reversible error by holding Defendants and Diehl in contempt on these grounds.

the Safe Distance Rule "prevent[s] known infringers from using trademarks whose use by non-infringers would not necessarily be actionable." *Taubman Co. v. Webfeats*, 319 F.3d 770, 778–79 (6th Cir. 2003) (citing *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir. 1930)).

The Safe Distance Rule gives courts a particularly useful tool in crafting and enforcing permanent injunctions. Once a party infringes on another's trademark or trade dress, the confusion sowed "is not magically remedied" by *de minimis* fixes. *Id.* at 779. "Instead, the confusion lingers, creating the need for the infringer not only to secure a new non-infringing name (or other infringing characteristic) for his product, but one so far removed from any characteristic of the plaintiff so as to put the public on notice that the two are not related." *Id.* In contempt proceedings, the Safe Distance Rule "reliev[es] the reviewing court of the need to retry the entire range of issues that may be relevant in an infringement action for each small variation the defendant makes to the enjoined mark." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 118 (2d Cir. 2008). If the law were otherwise, an enjoined party "could simply make a tiny change and start a new trademark contest all over again in the context of the contempt hearing as to use of the 'new' format." 5 McCarthy on Trademarks and Unfair Competition § 30:21 (4th ed. 2013).

The Safe Distance Rule is thus a well accepted part of the court's remedial toolkit. *See PRL*, 520 F.3d at 117–18 (collecting cases). But Defendants contend that this Circuit does not look favorably on the Safe Distance Rule in cases involving the Lanham Act. Defendants discern this disfavor from a sentence of dictum in *Taubman*, where we observed that the Safe Distance Rule pre-dated the Lanham Act by at least two decades, and commented that we "need not find whether the Safe Distance Rule has survived the enactment of" that statute. *Taubman*, 319 F.3d at 779. The parties have not directed us to anything in the Lanham Act that cabins the traditional power of the courts to tailor permanent injunctions as needed to accomplish equity. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."). No other circuit has questioned the continuing viability of the Safe Distance Rule; courts continue to employ this tool; and commentators continue to recommend it.

Our dictum in *Taubman* is best read against the particular facts of that case. *Taubman* was an appeal from a preliminary injunction, *see Taubman*, 319 F.3d at 779–80, not, as here, an appeal by a party held in contempt after violating a permanent injunction. Moreover, *Taubman* was not a commercial dispute at all. That case addressed whether a business could use the Lanham Act to shut down public debate about its commercial activities. *See id.* at 778–79. The Safe Distance Rule had no place in *Taubman*. But it is particularly apt in this case—where a serial infringer has tinkered with products to skirt a permanent injunction for commercial gain.

At oral argument, Defendants raised a new objection to the use of the Safe Distance Rule in this case. Defendants argue that even assuming that the Rule applies to trade*mark* claims, the Rule should not apply to trade *dress* claims, which are too subjective, Defendants contend, for the Safe Distance Rule to be applied fairly. We have found no authority suggesting that such a bifurcation of the Safe Distance Rule is appropriate. To the contrary, many courts have done what the district court did here—apply the Safe Distance Rule to ensure that a serial infringer respects protected trade dress. *See Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1155–56 (7th Cir. 1994); *Oral-B Labs., Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 (2d Cir. 1987), *superseded by rule on other grounds*.

The Safe Distance Rule is nothing more than a specialized application of the courts' traditional equitable power to craft permanent injunctions tailored to the needs of each case, and then enforce them with the sanction of contempt. The district court's permanent injunction in this case barred Defendants, their agents, and their confederates from marketing products that use marks "confusingly similar" to the protected trademark and trade dress of FHE. (R. 362, Permanent Injunction, at 8963.) Once Plaintiff moved for contempt, the district court did not err by refusing to go through a full likelihood-of-confusion analysis with Defendants' modified products. The district court was within its rights to simply determine whether the modified products were confusingly similar to FHE.[9] *See Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322–23 (9th Cir. 1997).

---

[9]We do not address whether it would have been an abuse of discretion if the district court *had* required Plaintiff to engage in a full likelihood-of-confusion analysis. *Compare Wella Corp. v. Wella Graphics, Inc.*, 37 F.3d 46, 48 (2d Cir. 1994) ("The district court therefore erred by employing the [likelihood-of-confusion] analysis . . . to evaluate the legality of a minor alteration of a mark already found to be infringing."), *with Badger*, 13 F.3d at 1156

**B.**        **The District Court's Contempt Ruling**

Applying the Safe Distance Rule, the district court found that the modified products were confusingly similar to FHE's protected mark. This was not an abuse of discretion. The district court found that "Defendants' new labels on their Nitro2Go Pure Energy product ha[d] a red-yellow-black color scheme that closely mimics Plaintiff's label: a black bottom with a yellow sunrise fading to red." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2013 WL 2145677, at \*5 (E.D. Mich. May 15, 2013). A glance at the pictures of Defendants' modified products shows that the district court's factual findings are not clearly erroneous. Defendants argue that they were attempting to make their modified products look more like Nitro2Go Instant Energy Extra Strength, which the jury found not to infringe on FHE's trade*mark*. But the jury made no such finding about that product's similarity to FHE's trade *dress*, meaning that this Nitro2Go bottle was not a failsafe guide for designing modified products. The district court sat through a lengthy trial where it heard evidence supporting many of the likelihood-of-confusion factors. It could visually compare the modified products with the FHE bottle. The district court did not abuse its discretion by holding that the modified products were confusingly similar to FHE.

In a final attempt to upset the district court's ruling, Defendants urge that the court effectively conducted a summary trial against three new defendants—Diehl, ETC, and Nitro Rocks. Defendants are wrong. There was no summary trial because the district court did not find that marketing the modified products violated the Lanham Act. The issue was not whether anyone infringed Plaintiff's protected marks, but whether Defendants and their agents had violated the permanent injunction. *See Wella Corp. v. Wella Graphics, Inc.*, 37 F.3d 46, 48 (2d Cir. 1994). The district court did not even hold ETC or NitroRocks in contempt, although it probably could have given Diehl's testimony about the overlaps among Defendants and these entities—including commingling of assets. *See* Fed. R. Civ. P. 65(d)(2)(C). And although the district court declined to enjoin Diehl in his personal capacity, Diehl is still subject to the injunction to the extent he acts as an agent of Defendants. *See* Fed. R. Civ. P. 65(d)(2)(B); *see*

---

("[W]hile the district court would have been within its discretion to require Hersey to choose a trade dress that avoided all possibility of confusion, it was not required as a matter of law to do so.").

*also Elec. Workers Pension Trust Fund of Local Union # 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 386 (6th Cir. 2003).  There was no summary trial.

## CONCLUSION

For these reasons, we **AFFIRM** the district court in full.

# Appendix

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**INNOVATION VENTURES, LLC**
**d/b/a LIVING ESSENTIALS,**
a Michigan limited liability company,

        *Plaintiff,*

vs.

**N2G DISTRIBUTING, INC.,**
a California corporation,
**ALPHA PERFORMANCE LABS**
a Nevada Corporation,

        *Defendants.*

HONORABLE PAUL D. BORMAN

CIVIL ACTION NO. **2:08-cv-10983**

## JURY VERDICT FORM

1.    Do you find that there is a Likelihood of Confusion between the 5-hour ENERGY®

Trademark used by Living Essentials and the following N2G products?  (CIRCLE ALL THAT

APPLY)



1

2.      Do you find that there is a Likelihood of Confusion between the Trade Dress of Living Essentials' "5-hour ENERGY" product and the following N2G products? (CIRCLE ALL THAT APPLY)



**IF YOU DID NOT CIRCLE ANY OF THE PRODUCTS ABOVE, DO NOT ANSWER QUESTION 3, AND GO ON TO QUESTION 4.  IF YOU CIRCLED ONE OR MORE PRODUCTS, ANSWER QUESTION 3 AND THEN GO ON TO QUESTION 4.**

2

3.      For any of the products that were circled in response to questions 1 or 2, do you find that

N2G's infringement of Living Essentials' Trademark or Trade Dress was intentional?

_____✗_____ Yes          _____ No          (Check the answer that applies.)

IF YOUR ANSWER TO QUESTION 3 IS "NO", THEN SKIP TO QUESTION 4, IF

YOUR ANSWER IS "YES", PLEASE CIRCLE THOSE PRODUCTS WHERE YOU

BELIEVE THERE WAS INTENTIONAL INFRINGEMENT AND THEN PROCEED TO

QUESTION 4:



3

4.   Do you find that any of the names or phrases on the following N2G products falsely describe N2G's products or the characteristics of the products? (CIRCLE ALL THAT APPLY)



4

**IF YOU FOUND THAT ANY PRODUCT OF N2G CONSTITUTED TRADEMARK INFRINGEMENT, TRADE DRESS INFRINGEMENT OR FALSE ADVERTISING IN YOUR ANSWERS TO QUESTIONS 1, 2 _or_ 4 ABOVE, CONTINUE TO QUESTION 5. OTHERWISE, SKIP TO QUESTION 6.**

5.      What amount of N2G's profits, if any, do you award Living Essentials based on the infringement by N2G?

$ _1,750,000_

6.      Were any of the defendants' profits from the products that contained the same Caution Statement as the Caution Statement used by the plaintiff attributable to the use of the Caution Statement?

_____Yes.          ___✕___No.      (Check the answer that applies.)

**IF YOUR ANSWER TO QUESTION 6 IS "YES", ANSWER QUESTION 7.  IF YOUR ANSWER IS "NO", DO NOT ANSWER ANY FURTHER QUESTIONS.**

7.      What is the amount of N2G's profits attributable to the products that had the same Caution Statement as the Caution Statement on the Living Essentials' products?

$_____

5

YOU HAVE COMPLETED THE JURY VERDICT FORM.   THE JURY FOREPERSON SHOULD DATE AND SIGN THE VERDICT FORM AND ADVISE THE COURT OFFICER THAT THE JURY HAS A VERDICT.

DATE: _11/18/11_

s/Jury Foreperson

In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal.

6